# EXHIBIT A

Electronically FILED by Superior Court of California, County of Los Angeles on 04/19/2021 12:00 AM Sherri R. Carter, Executive Officer/Clerk of Court, by R. Clifton,Deputy Clerk

Case 2:21-cv-03793-SVW-PVC   Document 1-1   Filed 05/04/21   Page 2 of 48   Page ID #:12

Assigned for all purposes to: Spring Street Courthouse, Judicial Officer: Thomas Long

Azar Mouzari, Esq. (STATE BAR NO. 263461)
**BEVERLY HILLS TRIAL ATTORNEYS, P.C.**
468 N. Camden Drive, Suite 238
Beverly Hills, California 90210
Telephone:     310-858-5567
Facsimile:     424-286-0963
Email: azar@bhtrialattorneys.com

Attorneys for Plaintiff, MARINA GOLDEN

### SUPERIOR COURT OF THE STATE OF CALIFORNIA

### COUNTY OF LOS ANGELES – CENTRAL DISTRICT

| | |
|---|---|
| MARINA GOLDEN, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>SANOFI-AVENTIS U.S., LLC, a Delaware Corporation; BOEHRINGER INGELHEIM PHARMACEUTICALS, INC., a Delaware Corporation; GLAXOSMITHKLINE, LLC, a Delaware Limited Liability Company; PFIZER, INC., a Delaware Corporation; AMERISOURCE HEALTH SERVICES, LLC, a Delaware Corporation; MYLAN PHARMACEUTICALS, INC., a West Virginia Corporation; PAR PHARMACEUTICAL, INC., a New York Corporation; L. PERRIGO COMPANY, a Michigan Corporation; TARO PHARMACEUTICALS U.S.A., INC., a New York Corporation;  TEVA PHARMACEUTICALS USA, INC., a Delaware Corporation; WOCKHARDT USA, LLC, a Delaware Limited Liability Company; ZYDUS PHARMACEUTICALS (USA), Inc., a New Jersey Corporation; CVS PHARMACY, INC., a Delaware Corporation; THE KROGER CO., an Ohio Corporation; WALGREEN CO., an Illinois Corporation; WALMART INC., an Arkansas Corporation, ALBERTSONS COMPANIES, INC., a Delaware Corporation; RITE AID CORPORATION, a Pennsylvania Corporation; and DOES 1-10, inclusive.<br><br>Defendants. | CASE NO.   21STCV14674<br><br><br>**COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

## **Table of Contents**

I.      INTRODUCTION ..................................................................................... 4

II.     PARTIES ................................................................................................... 4

     A.    Plaintiff .......................................................................................... 4

     B.    Manufacturer Defendants (Brand-Named)............................... 5

         1.    Defendant Sanofi ............................................................... 6

         2.    Defendant Boehringer ...................................................... 6

         3.    Defendant GSK .................................................................. 7

         4.    Defendant Pfizer ............................................................... 8

     C.    Manufacturer Defendants (Generic) .......................................... 8

         1.    Amerisource Bergen ......................................................... 8

         2.    Mylan .................................................................................. 9

         3.    Par Pharmaceutical ........................................................ 10

         4.    Perrigo .............................................................................. 10

         5.    Taro Pharmaceutical ...................................................... 11

         6.    Teva .................................................................................. 11

         7.    Wockhardt ........................................................................ 12

         8.    Zydus-Cadila .................................................................... 13

     D.    Retailers Defendants ................................................................. 13

         1.    CVS ................................................................................... 13

         2.    Kroger .............................................................................. 14

         3.    Walgreens ........................................................................ 15

         4.    Walmart ........................................................................... 15

         5.    Albertson's ...................................................................... 16

         6.    Rite Aid ............................................................................ 16

III.    JURISDICTION AND VENUE ............................................................ 17

IV.    FACTUAL BACKGROUND ................................................................. 17

A.    Brief History of Ranitidine and Zantac. ................................. 17

B.    The FDA Recall. ....................................................................... 19

C.    The Dangers of NDMA. ........................................................... 19

D.    How Ranitidine Transforms into NDMA Within the Human Body ................. 20

    1.    NDMA Forms in The Human Stomach. ............................. 20

    2.    Formation of NDMA in the Other Organs of Human Body .................. 24

    3.    Formation of NDMA by Exposure to Heat and/or Time. .......... 25

    4.    Ranitidine Exposure Is Directly Linked to Cancer. .......... 25

E.    Defendants Knew or Should Have Known of the NDMA Risk. ............ 26

F.    Equitable Tolling ...................................................................... 29

V.    CAUSES OF ACTION ............................................................................. 30

    STRICT LIABILITY – DESIGN DEFECT ............................................ 30

    STRICT LIABILITY – FAILURE TO WARN ........................................ 30

    NEGLIGENT MISREPRESENTATION ................................................. 31

    FRAUDULENT CONCEALMENT ......................................................... 32

    NEGLIGENCE – MANUFACTURE ....................................................... 33

    NEGLIGENCE - RETAILER ................................................................ 35

PUNITIVE DAMAGES ...................................................................................... 36

PRAYER FOR RELIEF ...................................................................................... 37

DEMAND FOR JURY TRIAL ........................................................................... 37

COMPLAINT
3
EXHIBIT A -- PAGE 3

Plaintiff, Ms. Marina Golden ("Plaintiff"), alleges the following based on information and belief:

## I.    INTRODUCTION

1.    This case concerns personal injuries suffered by Plaintiff as a result of ranitidine, the active ingredient in both Zantac and its generic forms ("Ranitidine-Containing Drugs"), which had been used to treat heartburn, upset stomach and ulcers since the early 1980's until April 1, 2020 when the U.S. Food and Drug Administration ("FDA") recalled all Ranitidine-Containing Drugs based on scientific evidence of a contaminant known as N-Nitrosodimethylamine (or "NDMA"), a human carcinogen, in the Ranitidine-Containing Drugs.

2.    Plaintiff has been diagnosed with breast cancer because of ingesting carcinogenic Ranitidine-Containing Drugs due to Defendants' willful misconduct and gross dereliction of duty.

3.    Had she known that Ranitidine-Containing Drugs would wreak such havoc to her body, Plaintiff would not have purchased or ingested any Ranitidine-Containing Drug.

4.    Plaintiff seeks redress to compensate her for her injuries and to strongly deter the type of misconduct that caused to the damages she has and will continue to suffer.

## II.    PARTIES

### A.    Plaintiff

5.    Plaintiff is a citizen of California and has resided in Los Angeles County, California at all relevant times.

6.    Plaintiff took prescription generic ranitidine (300 mg) from approximately 1981 to the late 1980's.  Plaintiff was prescribed generic ranitidine (300 mg) by a various physicians, including ones practicing at Axminster Medical Group.

7.    Plaintiff consumed over-the-counter Zantac (150 mg) from approximately the mid-1980's through 2017 to treat upset stomach and acid reflex on an as-needed basis.  More specifically, from 2014 – 2017, Plaintiff consumed over-the-counter Zantac (150 mg) to treat severe stomach issues during her cancer chemotherapy treatments.

8.    Plaintiff purchased her Ranitidine-Containing Drugs from various retailers in and

---

around Los Angeles County, California, including Albertson's, CVS Pharmacy, Rite Aid, Kroger, Walmart, and Walgreens.

9. As a direct and proximate result of ingesting carcinogenic Ranitidine-Containing Drugs due to Defendants' willful misconduct and gross dereliction of duty, Plaintiff was diagnosed with breast cancer in 2014.

10. Plaintiff would not have purchased, nor ingested Ranitidine-Containing Drugs had she known of the hazards associated with the human consumption of Ranitidine-Containing Drugs.

11. Plaintiff is informed and believes that as a direct and proximate result of Plaintiff's ingestion and/or exposure to Ranitidine-Containing Drugs distributed and supplied by Defendants, Plaintiff experienced conscious pain and suffering and bodily impairment, including, but not limited to breast cancer. To address the adverse physical effects and damage from Plaintiff's exposure to Ranitidine-Containing Drugs, Plaintiff required hospitalizations, in-patient surgeries, and other medical treatment.

12. Plaintiff suffered special damages including, but not limited to, medical expenses and loss of earnings. Additionally, Plaintiff suffered general damages including, but not limited to, pain and suffering, mental anguish, and loss of enjoyment of life.

**B. Manufacturer Defendants (Brand-Named)**

13. Defendants are collectively composed of entities that designed, manufactured, tested, marketed, labeled, packaged, handled, distributed, stored, and/or sold Ranitidine-Containing Drugs under the brand name Zantac or a generic equivalent by either prescription or over the counter. Defendants sold or otherwise made available ranitidine in the following forms: injection, syrup, granules, tablets and/or capsules.

14. Each defendant below regularly conducts business in the state of California, and its Ranitidine-Containing Drugs have been placed in the stream of commerce to be sold in California retail locations, including those located in Los Angeles.

15. Plaintiff ingested and/or was exposed to Ranitidine-Containing Drugs under the brand name Zantac from each of the manufacturers identified below.

---

COMPLAINT
5

**EXHIBIT A -- PAGE 5**

1                    **1.    Defendant Sanofi**

2         16.    Defendant Sanofi-Aventis U.S. LLC is a Delaware limited liability company with its

3    principal place of business located at 55 Corporate Drive, Bridgewater, New Jersey 08807. Sanofi-

4    Aventis U.S. LLC's sole member is Sanofi U.S. Services, Inc., a Delaware corporation with its

5    principal place of business in New Jersey.  Sanofi-Aventis U.S. LLC is a citizen of Delaware and

6    New Jersey.

7         17.    Sanofi US Services Inc. is a Delaware corporation with its principal place of business

8    located at 55 Corporate Drive, Bridgewater, New Jersey 08807.  Sanofi US Services Inc. is a citizen

9    of Delaware and New Jersey.

10        18.    Sanofi S.A. is a corporation formed and existing under the laws of

11   France, having a principal place of business at 54 Rue La Boetie, 8th Arrondissement, Paris, France

12   75008.  Sanofi S.A. is a citizen of France.

13        19.    Sanofi-Aventis U.S. LLC and Sanofi US Services Inc. are subsidiaries of Sanofi

14   S.A.

15        34.   Chattem, Inc. is a Tennessee corporation with its principal place of business located at

16   1715 West 38th Street Chattanooga, Tennessee 37409.  Chattem is a citizen of Tennessee.  Chattem

17   is a wholly owned subsidiary of French corporation Sanofi S.A.

18                    **2.    Defendant Boehringer**

19        20.    Defendant Boehringer Ingelheim Pharmaceuticals, Inc. is a Delaware corporation

20   with its principal place of business located at 900 Ridgebury Road, Ridgefield, Connecticut 06877.

21   Defendant Boehringer Ingelheim Pharmaceuticals, Inc. is a citizen of Delaware and Connecticut.

22        21.    Boehringer Ingelheim Corporation is a Nevada corporation with its principal place of

23   business located at 900 Ridgebury Road, Ridgefield, Connecticut 06877. Defendant Boehringer

24   Ingelheim Corporation is a citizen of Nevada and Connecticut.

25        22.    Boehringer Ingelheim USA Corporation is a Delaware corporation with its principal

26   place of business located at 900 Ridgebury Rd., Ridgebury, Connecticut 06877. Boehringer Ingelheim

27   USA Corporation is a citizen of Delaware and Connecticut.

28

23.     Boehringer Ingelheim International GmbH is a limited liability company formed and existing under the laws of Germany, having a principal place of business at Binger Strasse 173, 55216 Ingelheim AM Rhein, Rheinland-Phalz, Germany.  Boehringer Ingelheim International GmbH is a citizen of Germany.

24.     Boehringer Ingelheim Pharmaceuticals, Inc. is a direct or indirect subsidiary of Boehringer Ingelheim Corporation and Boehringer Ingelheim USA Corporation, which are wholly owned, directly, or indirectly, by Boehringer Ingelheim International GmbH. Collectively, these entities shall be referred to as "Boehringer Ingelheim."

25.     Boehringer Ingelheim Promeco, S.A. de C.V. is a foreign corporation organized and existing under the laws of Mexico with its principal place of business located at Maiz No. 49, Barrio Xaltocan, Xochimilco, Ciudad de Mexico, 16090 Mexico. Boehringer Ingelheim Promeco, S.A. de C.V. is a citizen of Mexico.

### 3.     Defendant GSK

26.     Defendant GlaxoSmithKline LLC, a Delaware limited liability company, has its principal place of business at Five Crescent Drive, Philadelphia, Pennsylvania, 19112. GlaxoSmithKline LLC's sole member is GlaxoSmithKline (America) Inc., a Delaware corporation with its principal place of business in that state.  GlaxoSmithKline LLC is a citizen of Delaware.

27.     Defendant GlaxoSmithKline (America) Inc. is a Delaware corporation with its principal place of business located at 1105 N. Market Street, Suite 622, Wilmington, Delaware 19801.  Defendant GlaxoSmithKline (America) Inc. is a citizen of Delaware.

28.     GlaxoSmithKline plc is a public limited company formed and existing under the laws of the United Kingdom, having a principal place of business at 980 Great West Road, Brentford Middlesex XO, TW8 9GS, United Kingdom.  GlaxoSmithKline plc is a citizen of the United Kingdom.

29.     GlaxoSmithKline LLC and GlaxoSmithKline (America) Inc. are subsidiaries of GlaxoSmithKline plc.

30.      Ranitidine's origins trace to Allen & Hanbury's Ltd., who was awarded a patent that

**COMPLAINT**
7

covered the ranitidine molecule from the U.S. Patent and Trademark Office in December 1978.  Allen & Hanbury, Ltd. was a subsidiary of Glaxo Labs, Ltd. during this period.   The FDA granted approval to Glaxo Holdings, Ltd. in 1983 to sell Zantac to the United States.

### 4.  Defendant Pfizer

31.  Defendant Pfizer Inc.  ("Pfizer") is a Delaware corporation with its principal place of business located at 235 East 42nd Street, New York, New York 10017.  Pfizer is a citizen of Delaware and New York.

32. Boehringer Ingelheim, GSK, Pfizer, and Sanofi are referred to collectively as the "Brand-Name Manufacturer Defendants."

33.  At all relevant times, the Brand-Name Manufacturer Defendants have conducted business and derived substantial revenue from their design, manufacture, testing, marketing, labeling, packaging, handling, distribution, storage, and/or sale of Zantac within each of the States and Territories of the United States, and the District of Columbia.   Every Brand-Named Manufacturer Defendant has conducted business and derived revenue in the state of California.

34.  Based on information and belief, Plaintiff has purchased, ingested, and/or has been exposed to Zantac manufactured by each of the Brand-Name Manufacturers in California.

### C.  Manufacturer Defendants (Generic)

### 1.  Amerisource Bergen

35.  Defendant Amerisource Health Services, LLC d/b/a American Health Packaging, is a Delaware limited liability company with its principal place of business located at 2550 John Glenn Avenue, Suite A, Columbus, Ohio 43217. Amerisource Health Services, LLC's sole member is AmerisourceBergen Corporation, a Delaware corporation with its principal place of business in Pennsylvania. Amerisource Health Services, LLC is a citizen of Delaware and Pennsylvania.

36.  AmerisourceBergen Corporation is a Delaware corporation with its principal place of business located at 1300 Morris Drive, Chesterbrook, Pennsylvania 19087. AmerisourceBergen Corp. is a citizen of Delaware and Pennsylvania.

37.     AmerisourceBergen Corporation handles about 20% of all pharmaceuticals sold and distributed throughout the United States.  The company has three distribution centers in California. These centers are located in Valencia, Corona, and Sacramento.

38.     Based on information and belief, Plaintiff has purchased, ingested, and/or has been exposed to generic Ranitidine-Containing Drugs distributed from these distribution centers in California.

### 2.     Mylan

39.      Defendant Mylan Pharmaceuticals, Inc. is a West Virginia corporation with its principal place of business located at 781 Chestnut Ridge Road, Morgantown, West Virginia 26505. Mylan Pharmaceuticals, Inc. is a citizen of West Virginia.

40.     Mylan Institutional LLC is a Delaware limited liability company with its principal place of business located at 1718 Northrock Court, Rockford, Illinois 61103. The sole member of Mylan Institutional LLC is Mylan, Inc., a Pennsylvania corporation with is principal place of business in that state. Mylan Institutional LLC is a citizen of Pennsylvania.

41.     Mylan, Inc. is a Pennsylvania corporation with its principal place of business located at 1000 Mylan Boulevard, Canonsburg, Pennsylvania 15317. Mylan, Inc. is a citizen of Pennsylvania.

42.     Mylan Laboratories Ltd., a non-party, is a corporation organized and existing under the laws of India with its principal place of business located at Plot No. 564/A/22, Road No. 92, Jubilee Hills 500 034, Hyderabad, India. Mylan Laboratories Ltd. is a citizen of India.

43.     Mylan Pharmaceuticals, Inc., Mylan Institutional LLC, Mylan Laboratories Ltd., and Mylan, Inc. are subsidiaries of non-party Mylan N.V.

44.     Based on information and belief, Plaintiff has purchased, ingested, and/or has been exposed to generic Ranitidine-Containing Drugs from customer retail locations in California that sell products from Mylan Pharmaceuticals Inc. and other subsidiaries of Mylan N.V.

### 3.    Par Pharmaceutical

45.    Defendant Par Pharmaceutical Inc. is a New York corporation with its principal place of business located at 6 Ram Ridge Road, Chestnut Ridge, New York 10977. Par Pharmaceutical Inc. is a citizen of New York.

46.    Par Pharmaceutical Inc. is a subsidiary of Endo International PLC, a non-party.

47.    Par Pharmaceutical Inc.'s products are distributed throughout the United States, including California.  The company's distribution center locations include Irvine, California.  The company has three distribution centers in California.

48.    Based on information and belief, Plaintiff has purchased, ingested, and/or has been exposed to generic Ranitidine-Containing Drugs distributed and sold in California from Par Pharmaceutical Inc.'s distribution centers.

### 4.    Perrigo

49.    Defendant L. Perrigo Co. is a Michigan corporation with its principal place of business located at 515 Eastern Avenue, Allegan, Michigan 49010. L. Perrigo Co. is a citizen of Michigan.

50.    Perrigo Research & Development Company is a Michigan corporation with its principal place of business located at 515 Eastern Avenue, Allegan, Michigan 49010. Perrigo Research & Development Company is a citizen of Michigan.

51.    L. Perrigo Co. and Perrigo Research & Development Company are subsidiaries of Perrigo Company, PLC, a non-party.

52.    Perrigo Co. is the largest manufacturer of OTC pharmaceuticals in the United States and is estimated to hold more than 50 percent of the store brand market.

53.    Based on information and belief, Plaintiff has purchased, ingested and/or has been exposed to generic Ranitidine-Containing Drugs from customer retail locations in California that sell products manufactured by Perrigo Co., including CVS and Walgreens.

**COMPLAINT**
10

**5.      Taro Pharmaceutical**

54.      Defendant Taro Pharmaceuticals U.S.A., Inc. is a New York corporation with its principal place of business located at Three Skyline Drive, Hawthorne, New York 10532. Taro Pharmaceuticals U.S.A., Inc. is a citizen of New York.

55.      Ranbaxy Inc. is a Texas corporation with its principal place of business located at 2 Independence Way, Princeton, New Jersey 08540. Ranbaxy Inc. is a citizen of Texas and New Jersey.

56.      Sun Pharmaceutical Industries, Inc., f/k/a Ranbaxy Pharmaceuticals Inc., is a Delaware corporation with is principal place of business located at 2 Independence Way, Princeton, New Jersey 08540. Sun Pharmaceutical Industries, Inc. is a citizen of Delaware and New Jersey.

57.      Sun Pharmaceutical Industries Ltd., a non-party, is corporation organized and existing under the laws of India with its principal place of business located at Western Express Highway Sun House, CTS No 201 B/1 Goregaon East, Mumbai, 400 063 India. Sun Pharmaceutical Industries Ltd. is a citizen of India.

58.      Taro Pharmaceutical Industries Ltd. is a corporation organized and existing under the laws of Israel with its principal place of business located at 14 Hakitor Street, Haifa Bay 2624761, Israel. Taro Pharmaceutical Industries Ltd. is a citizen of Israel.

59.      Taro Pharmaceuticals U.S.A., Inc., Ranbaxy Inc., Sun Pharmaceutical Industries, Inc. (f/k/a Ranbaxy Pharmaceuticals Inc.), and Sun Pharmaceutical Industries Ltd. are subsidiaries of Taro Pharmaceutical Industries Ltd., a non-party.

60.      Based on information and belief, Plaintiff has purchased, ingested, and/or has been exposed to generic Ranitidine-Containing Drugs from customer retail locations in California that sell products from Taro Pharmaceuticals U.S.A. and other subsidiaries of Taro Pharmaceutical Industries Ltd.

**6.      Teva**

61.      Defendant Teva Pharmaceuticals U.S.A., Inc. is a Delaware corporation with its principal place of business in Pennsylvania. Actavis Mid Atlantic LLC is a Delaware limited liability company with its principal place of business located at 1877 Kawai Rd., Lincolnton, North Carolina

28092. The membership interest of Actavis Mid Atlantic LLC is owned by Teva Pharmaceuticals U.S.A., Inc., either directly or through an intervening limited liability company. Actavis Mid Atlantic LLC is a citizen of Delaware and Pennsylvania.

62.     Teva Pharmaceuticals U.S.A., Inc. is a Delaware corporation with its principal place of business located at 400 1090 Horsham Road, North Wales, Pennsylvania 19454.

63.     Teva Pharmaceuticals U.S.A., Inc. is a citizen of Delaware and Pennsylvania.

64.     Watson Laboratories, Inc. is a Nevada corporation with its principal place of business located at 400 Interpace Parkway, Building A, Parsippany, New Jersey 07054. Watson Laboratories, Inc. is a citizen of Nevada and New Jersey.

65.     Teva Pharmaceutical Industries Ltd. is a corporation organized and existing under the laws of Israel with its principal place of business located at 5 Basel Street, Petach Tikva, Israel, 4951033. Teva Pharmaceutical Industries Ltd is a citizen of Israel.

66.      Actavis Mid Atlantic LLC, Teva Pharmaceuticals U.S.A., Inc., and Watson Laboratories, Inc. are subsidiaries of Teva Pharmaceutical Industries Ltd., a non-party.

67.     Teva Pharmaceutical U.S.A., Inc., is the largest manufacturer of generic drugs in the U.S. It has 130 offices located throughout the U.S., including one in Irvine, California.

68.     Based on information and belief, Plaintiff has purchased, ingested, and/or has been exposed to generic Ranitidine-Containing Drugs from customer retail locations in California that sell products manufactured by Teva Pharmaceutical U.S.A., Inc., including CVS and Walgreens.

**7.     Wockhardt**

69.      Defendant Wockhardt USA LLC is a Delaware limited liability company with its principal place of business located at 20 Waterview Boulevard, Parsippany, New Jersey 07054. Upon information and belief, the sole member of Wokhardt USA LLC is Wockhardt USA, Inc., a Delaware corporation with its principal place of business in New Jersey. Wockhardt USA LLC is a citizen of Delaware and New Jersey.

70.    Wockhardt USA, Inc. is a Delaware corporation with its principal place of business located at 135 Route 202/206, Bedminster, New Jersey 07921. Wockhardt USA, Inc. is a citizen of Delaware and New Jersey.

71.    Wockhardt, Ltd. is a corporation organized and existing under the laws of India with its principal place of business located at Wockhardt Towers, Bandra Kurla Complex, Bandra (East), Mumbai 400051, Maharashtra, India. Wockhardt, Ltd. is a citizen of India.

72.    Wockhardt USA LLC and Wockhardt USA, Inc. are subsidiaries of Wockhardt, Ltd.

73.    Wockhardt USA LLC distributes its products throughout the United States.  Based on information and belief, Plaintiff has purchased, ingested, and/or has been exposed to generic Ranitidine-Containing Drugs distributed by Wockhardt USA LLC in California.

### 8.    Zydus-Cadila

74.    Defendant Zydus Pharmaceuticals (USA) Inc. is a New Jersey corporation with its principal place of business located at 73 Route 31 North, Pennington, New Jersey 08534. Zydus Pharmaceuticals (USA) Inc. is a citizen of New Jersey.

75.    Cadila Healthcare Ltd. is a corporation organized and existing under the laws of India with its principal place of business located at Zydus Tower, Satellite Crossroads, Sarkhej-Gandhinagar Highway, Amedabad 380 015, India. Cadila Healthcare Ltd. is a citizen of India.

76.    Zydus Pharmaceuticals (USA) Inc. is a subsidiary of Cadila Healthcare Ltd. These entities operate under the trade name of, and shall be referred to as, "Zydus-Cadilla."

77.    Zydus Pharmaceuticals (USA) Inc distributes its products throughout the United States.  Based on information and belief, Plaintiff has purchased, ingested, and/or has been exposed to generic Ranitidine-Containing Drugs manufactured and distributed by Zydus Pharmaceuticals in California.

### D.    Retailers Defendants

### 1.    CVS

78.    Defendant CVS Pharmacy, Inc. ("CVS") is a Delaware corporation with its principal places of business located at One CVS Drive, Woonsocket, Rhode Island 02895. Defendant CVS is

---

**COMPLAINT**

13

# EXHIBIT A -- PAGE 13

a citizen of Delaware and Rhode Island.

79.     In 2015, CVS Health Corporation acquired Target Corporation's pharmacies and clinics. CVS defined herein includes any current or former Target Corporation pharmacy.

80.     On November 28, 2018, CVS Health completed the acquisition of Aetna.

81.     CVS/pharmacy acquired Longs Drugs Stores Corporation in 2008.  Longs Drug Stores Corporation was incorporated in Maryland on May 24, 1985 as successor to Longs Stores. Longs Stores was incorporated in 1946 in California, and its principal place of business was 141 North Civic Drive, Walnut Creek, California 94596.

82.     Longs Drugs Stores Corporation's principal subsidiaries were Longs Drugs Stores California, Inc. and RXAmerica, LLC.

83.     RXAmerica, LLC provides pharmacy benefit management services.  CVS acquired RxAmerica, LLC on October 20, 2008.

84.     At all relevant times, Plaintiff regularly purchased and ingested Ranitidine-Containing Drugs from CVS and Longs Drugs Stores locations in California, including stores in Los Angeles.

**2.     Kroger**

85.     Defendant the Kroger Co. is an Ohio corporation with its principal place of business located at 1014 Vine Street, Cincinnati, Ohio 45202. The Kroger Co. is a citizen of Ohio.

86.     Smith's Food and Drug Centers, Inc. is an Ohio corporation with its principal place of business located at 1014 Vine Street, Cincinnati, Ohio 45202. Smith's Food and Drug Centers, Inc. is a citizen of Ohio.

87.     Fred Meyer Stores, Inc. is an Ohio corporation with its principal place of business located at 3800 SE 22nd Avenue, Portland, Oregon 97202. Fred Meyer Stores, Inc. is a citizen of Ohio and Oregon.

88.     Smith's Food and Drug Centers, Inc. and Fred Meyer Stores, Inc. are subsidiaries of the Kroger Co.

89.     At all relevant times, Plaintiff purchased and ingested, or was otherwise exposed, to Ranitidine-Containing Drugs from Kroger Co. and/or its subsidiaries' locations in California, including stores in Los Angeles.

### 3.     Walgreens

90.     Defendant Walgreen Co. is a Delaware corporation with its principal place of business located at 108 Wilmot Road, Deerfield, Illinois 60015. Walgreen Co. is a citizen of Delaware and Illinois.

91.     Defendant Duane Reade, Inc. is a Delaware corporation with its principal place of business located at 108 Wilmot Road, Deerfield, Illinois 60015. Duane Reade, Inc. is a citizen of Delaware and Illinois.

92.     Defendant Walgreens Boots Alliance, Inc. is a Delaware corporation with its principal place of business located at 108 Wilmot Road, Deerfield, Illinois 60015. Walgreens Boots Alliance is a citizen of Delaware and Illinois.

93.     Walgreen Co. and Duane Reade, Inc. are subsidiaries of Walgreens Boots Alliance.

94.     Plaintiff purchased and ingested Ranitidine-Containing Drugs from Walgreen Co. and/or its subsidiaries in California, including stores in Los Angeles at all relevant times.

### 4.     Walmart

95.     Defendant Walmart Inc. f/k/a Wal-Mart Stores, Inc. is a Delaware corporation with its principal place of business located at 702 SW 8th Street, Bentonville, Arkansas 72716. Walmart Inc. is a citizen of Delaware and Arkansas.

96.     At all relevant times, Plaintiff purchased and ingested Ranitidine-Containing Drugs from pharmacies at Walmart locations in California, including stores in Los Angeles.

### 5. Albertson's

97.     Defendant Albertson's Companies, Inc. is a Delaware corporation with its principal place of business located at 132 E. Lake Street, McCall, Idaho 83638.  Albertson's is a citizen of Delaware and Idaho.

98.      Safeway, Inc. is a Delaware corporation with its principal place of business located at 5918 Stoneridge Mall Road, Pleasanton, California 94588.  Safeway, Inc. is a citizen of Delaware and California.

99.     Safeway, Inc. is a subsidiary of Albertson's.

100.    At all relevant times, Plaintiff purchased, purchased, ingested, or was otherwise exposed to Ranitidine-Containing Drugs from Albertson's or Safeway locations in California, including stores in Los Angeles.

### 6. Rite Aid

101.    Defendant Rite Aid Corporation ("Rite Aid") is a Delaware corporation with its principal place of business located at 30 Hunter Lane, Camp Hill, Pennsylvania 17011.  Rite Aid is a citizen of Delaware and Pennsylvania.

102.    At all relevant times, Plaintiff purchased, ingested, or was otherwise exposed to Ranitidine-Containing Drugs from Rite Aid locations in California, including stores in Los Angeles.

103.    The true names or capacities, whether individual, corporate, associate or otherwise of defendants, DOES 1 through 10, inclusive, are unknown to Plaintiff who therefore sues said DOE defendants by such fictitious names.

104.    Plaintiff is informed and believes, and thereon alleges that each of the defendants designated herein as a DOE is responsible for the unlawful acts as herein alleged, and Plaintiff will request leave of the Court to amend this complaint to show its true names and capacities when the same have been ascertained.

105.    Plaintiff is informed and believes, and thereon alleges that at all times herein

mentioned, Defendants, and each of them, were the agents, servants, and employees each of the other, acting within the course and scope of said agency and employment, with the full knowledge and consent of each of the Defendants. Each of the acts and/or omissions alleged herein were made known to and ratified by each of the Defendants (including any DOE defendant).

106.    Defendant and each and every DOE Defendant shall be referred to collectively as "Defendants" hereafter.

## III.    JURISDICTION AND VENUE

107.    This Court has jurisdiction over all causes of action asserted herein, and the amount in controversy exceeds the jurisdictional minimum of this Court.

108.    Defendants caused tortious injury by acts and omissions in this judicial jurisdiction and caused tortious injury in this jurisdiction by acts and omissions outside this jurisdiction while regularly doing and soliciting business, engaging in a persistent course of conduct, and deriving substantial revenue from goods used or consumed and services rendered in this jurisdiction.

109.    Defendants, and each of them, are subject to the jurisdiction of this Court by virtue of their dealings and transactions in Los Angeles County and by having caused injuries through their acts and omissions within this County to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

110.    Venue is proper in this Court because the injury and damage to Plaintiff occurred within Los Angeles County. California Code of Civ. Proc. § 395(a).

111.    Plaintiff seeks relief that is in the jurisdictional limits of the Court.

## IV.    FACTUAL BACKGROUND

### A.    Brief History of Ranitidine and Zantac

112.    Scientist John Bradshaw originally discovered and developed Zantac (ranitidine) on behalf of GSK in 1976.

113.    Zantac has been sold to consumers since the early 1980's, first by prescription and later as an over-the-counter ("OTC") medication.

114.    The drug is in a class of medications called histamine H2-receptor antagonists (or H2 blockers).  H2 blockers decrease the amount of acid produced by cells in the lining of the stomach.

115.    Cimetidine (Tagamet), discovered and developed by Smith, Kline and French2, was the first H2 blocker to be developed and is the prototypical histamine H2 receptor antagonist. The later members of the class were developed from Tagamet. Specifically, Zantac was developed by GSK in response to the success of cimetidine.

116.    In 1983, the FDA approved the sale of prescription Zantac, (NDA 18-703), and Zantac quickly became one of GSK's most successful products.  Zantac was the first prescription drug in history to reach $1 billion in sales.

117.    Beginning in 1995, the FDA approved the sale of various forms of OTC Zantac.

118.    GSK's patent on the original prescription Zantac product expired in 1997, allowing generic manufacturers to sell prescription ranitidine to consumers.

119.    The FDA approved numerous generic manufacturers for the sale of prescription and OTC ranitidine.

120.    Even after the entry of generic competition, brand name manufacturers continued to sell prescription and OTC Zantac.

121.    The joint venture between GSK and Warner-Lambert ended in 1998, with Warner-Lambert retaining control over the sale of OTC Zantac in the United States and GSK retaining control over the sale of prescription Zantac in the United States.

122.    Pfizer acquired Warner-Lambert in 2000 and took control of the sale of OTC Zantac in the United States.

123.    The right to sell OTC Zantac in the United States later passed to Defendant Boehringer Ingelheim Pharmaceuticals and then to Sanofi.

124.    In 2017, Boehringer Ingelheim sold the rights to OTC Zantac to Sanofi pursuant to a Sales Purchase Agreement. As part of this deal, Sanofi obtained control and responsibility over Boehringer Ingelheim's entire consumer healthcare business, including the OTC Zantac NDAs. However, Boehringer Ingelheim continued to manufacture all drugs subject to the SPA, including

1   Zantac.

2   125.   When GSK's and Pfizer's patent on the original OTC Zantac product expired, generic

3   manufacturers could sell OTC ranitidine to consumers.

4   126.   Sanofi controlled the NDAs for OTC Zantac and marketed, distributed, and sold

5   Zantac in the United States from January 2017, until the FDA issued a recall in 2019.

6   **B.      The FDA Recall**

7   127.   On April 1, 2020, the FDA requested the voluntary withdrawal of all Ranitidine-

8   Containing Drugs from the market after it began reviewing the safety of ranitidine, with specific

9   focus on the presence of NDMA.

10   **C.      The Dangers of NDMA**

11   128.   The U.S. Department of Health and Human Services ("DHHS") that NDMA is

12   reasonably anticipated to be a human carcinogen.[1]

13   129.   The high levels of NDMA produced by Zantac are inherent to the molecular structure

14   of ranitidine, the active ingredient in Zantac. The ranitidine molecule contains both a nitrite and DMA

15   group which are well known to combine to form NDMA. Ranitidine produces NDMA by "react[ing]

16   with itself," such that every dosage of ranitidine exposes consumers to NDMA.

17   130.   According to the U.S. Environmental Protection Agency ("EPA"), "NDMA is a

18   semivolatile organic chemical that forms in both industrial and natural processes[.]"[2]   It is one of the

19   simplest members of a class of N-nitrosamines, a family of potent carcinogens. Scientists have long

20   recognized the dangers that NDMA poses to human health.

21   131.   Both the EPA and the IARC classify NDMA as a probable human carcinogen.[3]

22   Further, in 1978, IARC stated that NDMA "should be regarded for practical purposes as if it were

23

24

25   [1]   U.S. Envtl Prot. Agency, Technical Fact Sheet – N-Nitroso-dimethylamine (NDMA) (Nov. 2017), https://www.epa.gov/sites/production/files/2017-10/documents/ndma_fact_sheet_update_9-15-17_508.pdf.

26

27   [2]   *Id.*
      [3]   *Id.*; International Agency for Research on Cancer (IARC) - Summaries & Evaluations, N-NITROSODIMETHYLAMINE (1978), http://www.inchem.org/documents/iarc/vol17/n-nitrosodimethylamine.html.

28

1  carcinogenic to humans."[4]

2      132.    The World Health Organization states that there is "conclusive evidence that NDMA

3  is a potent carcinogen" and that there is "clear evidence of carcinogenicity."[5]

4      **D.    How Ranitidine Transforms into NDMA Within the Human Body**

5      133.    The ranitidine molecule itself contains the constituent molecules to form NDMA.

6      134.    Specifically, the O=N (Nitroso) on one side of the ranitidine molecule can combine

7  with the H3C-N-CH3 (DMA) on the other side to form NDMA.

8      135.    The formation of NDMA by the reaction of DMA and a nitroso source (such as a

9  nitrite) is well characterized in the scientific literature and has been identified as a concern for

10  contamination of the U.S. water supply.  In 2003, alarming levels of NDMA in drinking water

11  processed by wastewater treatment plants was specifically linked to the presence of ranitidine.

12      136.    Ranitidine leads to NDMA exposure in four ways: (a) formation of NDMA in the

13  human digestive system; (b) formation of NDMA due to an enzymatic reaction throughout the human

14  body; (c) formation of NDMA over time under normal storage conditions and that increases

15  significantly when exposed to heat; and (d) formation of NDMA during manufacture.

16      **1.    NDMA Forms in The Human Stomach**

17      137.    When the ranitidine molecule is exposed to the acidic environment of the stomach,

18  particularly when accompanied by nitrites (a chemical commonly found in heartburn-inducing

19  foods), the Nitroso molecule (O=N) and the DMA molecule (H3C-N-CH3) break off and reform as

20  NDMA.

21      138.    In 1981, two years before the FDA approved Zantac, Dr. Silvio de Flora published the

22  results of experiments he conducted on ranitidine in the well-known journal, The Lancet. When

23  ranitidine was exposed to human gastric fluid in combination with nitrites, his experiment showed

24

25

---

26    [4] IARC, Monographs on the Evaluation of the Carcinogenic Risk of Chemicals to Humans, Some N-Nitroso Compounds, Vol. 17, 151-152 (May 1978) (Emphasis added.).

27    [5] WHO, Guidelines for Drinking-Water Quality, N-Nitrosodimethylamine (NDMA) (3d ed. 2008), https://www.who.int/water_sanitation_health/dwq/chemicals/ndmasummary_2ndadd.pdf.  (Emphasis added.).

28

"toxic and mutagenic effects[.]"[6]  Dr. Flora formed the hypothesis that these mutagenic effects could have been caused by the "formation of more than one nitroso derivative [which includes NDMA] under our experimental conditions." *Id*.  Dr. Flora cautioned that, concerning ranitidine ingestion, "it would seem prudent to ... suggest[] a diet low in nitrates and nitrites, by asking patients not to take these at times close to (or with) meals[.]" *Id*.

139.    Notwithstanding Dr. Flora's findings in 1981, GSK told the FDA in the early 1980's that the nitrite would not likely be formed in the stomach because an unrealistically large amount of the nitrate needs to be present to form and maintain the nitrosamine.  GSK even applied for and obtained an indication for OTC Zantac "[f]or the prevention of meal-induced heartburn at a dose of 75 mg taken 30 to 60 minutes prior to a meal."

140.    Additionally, before Zantac was approved by the FDA, GSK admitted to the FDA that its own studies evidenced that ranitidine use caused the proliferation of bacteria in the human stomach known to convert nitrates to nitrites and elevated levels of nitrite in the stomach. While GSK did acknowledge that this could increase the risk of developing cancer, the risk was dismissed based on assumptions about human eating habits at that time.

141.    Summarily, GSK knew—before Zantac hit the market —that ranitidine could react with nitrite in the human stomach to form NDMA, and that long-term use of ranitidine could result in elevated levels of nitrite in the human stomach.

142.    In response to Dr. Flora's findings, GSK conducted a clinical study in 1982 (republished in 1987) that purportedly tested for NDMA.  However, the gold-standard mass spectrometry to test for NDMA was not utilized to support GSK's findings.  Instead, GSK used a process that inefficiently measured N-nitrosamines. Even more telling, GSK failed to test the gastric samples that included ranitidine in them.

143.    In 1983, Dr. Flora, along with four other researchers, published their complete findings

---

[6]   Silvio de Flora, *Cimetidine, Ranitidine and Their Mutagenic Nitroso Derivatives*, 318 THE LANCET 8253, 993−94 (Oct. 31, 1981).

1  regarding the genotoxicity of ranitidine.[7]  Dr. Flora's team "confirm[ed] our preliminary findings on

2  the formation of genotoxic derivatives from nitrite and ranitidine[,]" emphasizing "the widespread

3  clinical use [of ranitidine] and the possibility of a long-term maintenance therapy suggest the prudent

4  adoption of some simple measures, such as a diet low in nitrates and nitrites or the prescription of

5  these anti-ulcer drugs at a suitable interval from meals." *Id*.

6  144.  The high instability of the ranitidine molecule was elucidated in multiple scientific

7  studies investigating ranitidine as a source of NDMA in drinking water and specific mechanisms for

8  the breakdown of ranitidine were proposed.[8]  These studies underscore the instability of the NDMA

9  group on the ranitidine molecule and its ability to form NDMA in the environment of water treatment

10  plants which supply many American cities with water.

11  145.  In 2016, researchers at Stanford University conducted an experiment by measuring the

12  NDMA in urine of healthy individuals over the course of 24 hours and administering one dose of

13  ranitidine, then measuring the NDMA in the urine of the same volunteers for another 24 hours.[9]  The

14  study found that the level of NDMA generally increased by a staggering 400 times.

15  146.  The Stanford study clearly proved that unsafe levels of NDMA are formed in the

16  human body as a result of ranitidine ingestion.

17  147.  On September 9, 2019, Valisure LLC and ValisureRX LLC, a pharmacy and testing

18  laboratory, filed a Citizen Petition calling for the recall of all Ranitidine-Containing Drugs due to

19  scientific studies demonstrating that ranitidine can transform into the cancer-causing NDMA.

20  148.  The results of Valisure's testing show levels of NDMA well above 2 million ng per

21  150 mg Zantac tablet, as shown below in Table 1.

22

23

24

25

26  [7]  Silvio de Flora, *et al., Genotoxicity of nitrosated ranitidine,* 4 CARCINOGENESIS 3, 255-60 (1983).
    [8]  Le Roux, et al., *NDMA Formation by Chloramination of Ranitidine: Kinetics and Mechanism*, 46 Environ.
    Sci. Technol 20, 11095-103 (2012).

27  [9]  Zeng, et al., *Oral intake of ranitidine increases urinary excretion of N-nitrosodimethylamine*, 37
    CARCINOGENESIS 625-34 (2016).

28

| Table 1 — Ranitidine Samples Tested by Valisure Laboratory Using GC/MS Protocol | | |
|---|---|---|
| 150 mg Tablets or equivalent | Lot # | NDMA per tablet (ng) |
| Reference Powder* | 125619 | 2,472,531 |
| Zantac, Brand OTC | 18M498M | 2,511,469 |
| Zantac (mint), Brand OTC | 18H546 | 2,834,798 |
| Wal-Zan, Walgreens | 79L80081 9A | 2,444,046 |
| Wal-Zan (mint), Walgreens | 8ME2640 | 2,635,006 |
| Ranitidine, CVS | 9BE2773 | 2,520,311 |
| Zantac (mint), CVS | 9AE2864 | 3,267,968 |
| Ranitidine, Equate | 9BE2772 | 2,479,872 |
| Ranitidine (mint), Equate | 8ME2642 | 2,805,259 |
| Ranitidine, Strides | 77024060A | 2,951,649 |

149.    Valisure's testing shows, on average, 2,692,291 ng of NDMA in one 150 mg Zantac tablet. Considering the FDA's permissible limit is 96 ng, this would put the level of NDMA at 28,000 times the legal limit. Smoking at least 6,200 cigarettes achieves the same levels of NDMA found in one 150 mg dose of Zantac.

150.    On September 26, 2019, Walgreens, Walmart, Rite-Aid, and Apotex Corp.—makers of generic OTC ranitidine—voluntarily recalled all Ranitidine-Containing Drugs and removed the drugs from the shelves.

151.    On September 28, 2019, CVS Health Corp. announced that it would terminate the sale of Zantac and its own generic Ranitidine-Containing Drugs due to concerns that it might contain a carcinogen.

152.    Sanofi voluntarily recalled all brand-name OTC Zantac on October 18, 2019.

153.    The results of Valisure's tests on ranitidine tablets in biologically relevant conditions illustrate significant NDMA formation under simulated gastric conditions with nitrite present.

154.    Under biologically relevant conditions, when nitrites are present, high levels of NDMA are found in one dose of 150 mg Zantac, ranging between 245 and 3,100 times above the

FDA's permissible limit. One would need to smoke over 500 cigarettes to achieve the same levels of NMDA found in one dose of 150 mg Zantac at the 25 nanogram level (over 7,000 for the 50 nanogram level).

155.    Assessed overall, the scientific data in literature demonstrates that the ingestion of ranitidine in the presence of human-relevant levels of nitrite in the stomach—a substance that is commonly found in foods that induce heartburn and that is known to be elevated in people taking ranitidine for longer than a month—the ranitidine molecule breaks down into levels of NDMA that would dramatically increase a person's risk of developing cancer

### 2.    Formation of NDMA in the Other Organs of Human Body

156.    Valisure's findings also identified a possible enzymatic mechanism for the liberation of ranitidine's DMA group via the human enzyme dimethylarginine dimethylaminohydrolase ("DDAH"), which can occur in other tissues and organs separate from the stomach.

157.    Computational modelling demonstrates that ranitidine can readily bind to the DDAH-1enzyme in a manner comparable to the natural substrate of DDAH-1 known as asymmetric dimethylarginine.

158.    This is an indicator that the enzyme DDAH-1 increases formation of NDMA in the human body when ranitidine is present; therefore, the expression of the DDAH-1 gene is useful for identifying organs most susceptible to this action.

159.    While DDAH-1 is most strongly expressed in the kidneys, it is broadly distributed throughout the body, including the liver, prostate, stomach, bladder, brain, colon, and prostate. This distribution offers both a general mechanism for NDMA formation in the human body from ranitidine and specifically causes concern for NDMA's effects on numerous organs, such as the bladder.

160.    The possible enzymatic reaction of ranitidine to DDAH-1, or other enzymes, suggests that high levels of NDMA can form throughout the human body - ranitidine metabolizes and circulates throughout the human body, crossing the placental and blood-brain barrier, within 1-2 hours. When the ranitidine interacts with the DDAH-1 enzyme in various organs throughout the body, it breaks down into NDMA, as validated by the Stanford Study.

### 3.     Formation of NDMA by Exposure to Heat and/or Time

161.     As indicated in Valisure's September 2019 Citizen Petition to the FDA, the risk of creating NDMA by exposing ranitidine to heat is generally known and documented in the scientific community from the early 1980's.

162.     In response to Valisure's Petition, on October 2, 2019, the FDA recommended that researchers use the LC-HRMS protocol for detecting NDMA in ranitidine because the contemporaneous "testing method does not use elevated temperatures" and has been proven capable of detecting NDMA.

163.     In or about early 2020, Emery Pharma ran a series of tests on ranitidine using the FDA-recommended LC-HRMS protocol.  During these tests, the researchers exposed ranitidine to 70 °C at different periods of time.  The results showed that increasing levels of NDMA formed based on exposure to heat. The researchers cautioned (emphasis added):

> **NDMA accumulates in ranitidine-containing drug products on exposure to elevated temperatures, which would be routinely reached <u>during shipment and during storage</u>.** More importantly, these conditions occur post-lot release by the manufacturer. Hence, **while NDMA levels in ranitidine may be acceptable at the source, they may not be so when the drug is <u>purchased</u> and subsequently at the time of <u>consumption by the consumer</u>**.

164.     Given these facts, in conjunction with the historical data from the 1980s, it is evident that during normal transport and storage, and especially when exposed to heat, the ranitidine molecule systematically breaks down into cancer causing NDMA, accumulating over time in the finished product.

165.     Considering ranitidine-containing products have an approved shelf life of 36 months, the possibility, and even likelihood, of the drug accumulating dangerously high levels of NDMA prior to consumption is unreasonably high.

### 4.     Ranitidine Exposure Is Directly Linked to Cancer

166.     In addition to studies examining how NDMA causes cancer in humans, researchers have also specifically linked ranitidine with cancer.

167.     One epidemiology study, published in 2004, showed that men taking either ranitidine

1    or cimetidine (Tagamet) experienced increased risks of bladder cancer.[10]

2    168.    In another comprehensive epidemiological study that examined various cancer risks

3    and H2 blockers, including ranitidine, the data showed that ranitidine consumption increased the risk

4    of prostate, lung, esophageal, pancreatic, and kidney cancer. Notably, the study also indicated that

5    people under the age of 60 that took ranitidine were five times more likely to contract prostate cancer.

6    169.    A study published in 2018 demonstrated an increased risk of liver cancer associated

7    with use of ranitidine in comparison with other histamine type 2 receptor antagonists (H2RAs) in the

8    class.[11]

9    170.    Another study in 2018 found an increased risk in hepatocellular carcinoma associated

10   with use of H2RAs.[12]   The authors evaluated the risk of cancer in association with proton pump

11   inhibitors and looked at H2RAs as a confounder.  Even narrowed to consideration of use of H2RAs

12   within one year of cancer diagnosis, the study showed an increased odds ratio associated with use of

13   H2RAs and hepatocellular carcinoma, a type of liver cancer.

14        **E.    Defendants Knew or Should Have Known of the NDMA Risk**

15   171.    Between 2014 and 2017, when Plaintiff purchased and ingested Ranitidine-Containing

16   Drugs, Defendants knew or should have known that the weight of scientific evidence showed that

17   Ranitidine-Containing Drugs exposed consumers to dangerous levels of NDMA.

18   172.    Defendants failed to disclose this risk to consumers on the drug's label—or through

19   any other means—and Defendants failed to report these risks to the FDA.

20   173.    As early as 1981, scientific research was available that evidenced elevated rates of

21   NDMA.  This was known or should have been known by the Defendants when they began marketing,

22   promoting, labelling, and selling Ranitidine-Containing Drugs.

23   174.    Defendants concealed the dangerous hazards of ingesting Zantac and Ranitidine-

24

25        [10] D. Michaud, et al, *Peptic Ulcer Disease and the Risk of Bladder Cancer in a Prospective Study of Male Health Professionals*, 13 CANCER EPI. BIOMARK. & PREV. 250-54, 252 (Feb. 2004).

26        [11] Kim Tu Tran,, et al., *Proton pump inhibitor and histamine-2 receptor antagonist use and risk of liver cancer in two population-based studies,* 48 ALIMENTARY PHARMA & THERAP 1, 55-64 (2018).

27        [12] Shao, Y-HJ, et al., *Association between proton pump inhibitors and the risk of hepatocellular carcinoma,* 48 ALIMENTARY PHARMA & THERAP 4, 460-68 (2018).

28

**COMPLAINT**
26

Containing Drugs from consumers by neglecting to report it to the FDA, which in turn relies on manufacturers (and testing laboratories) to bring new information about approved drugs.

175.    Manufacturers of an approved drug are required by regulations to submit an annual report to the FDA containing, among other things, new information regarding the drug's safety pursuant to 21 C.F.R. § 314.81(b)(2):

> The report is required to contain . . . [a] brief summary of significant new information from the previous year that might affect the safety, effectiveness, or labeling of the drug product. The report is also required to contain a brief description of actions the applicant has taken or intends to take as a result of this new information, for example, submit a labeling supplement, add a warning to the labeling, or initiate a new study.

176.    21 C.F.R. § 314.81(b)(2)(v) provides:

> The manufacturer's annual report also must contain copies of unpublished reports and summaries of published reports of new toxicological findings in animal studies and in vitro studies (e.g., mutagenicity) conducted by, or otherwise obtained by, the [manufacturer] concerning the ingredients in the drug product.

177.    Defendants ignored these regulations and, disregarding the scientific evidence available to them, did not report to the FDA significant new information affecting the safety or labeling of Ranitidine-Containing Drugs.

178.    Knowledge regarding the risk of NDMA in ranitidine was sufficiently accessible in publicly available scientific literature that any maker or distributor, consistent with their heightened obligations to ensure the safety of their products, should have known about the potential NDMA risks associated with ranitidine consumption.

179.    Defendants failed to warn the public and failed to conduct and/or publish and share relevant studies or testing with the FDA and scientific community concerning the link between NDMA and Ranitidine-Containing Drugs.

180.    Defendants also knew that they are required by federal law to store, warehouse, and distribute pharmaceutical drugs in accordance with current "Good Manufacturing Practices" ("GMPs") to ensure they meet safety, quality, purity, identity, and strength standards. *See* 21 U.S.C. § 351(a)(2)(B).

181.    21 C.F.R. § 211.142(b) states that the GMPs required that warehousing of drug

products shall be performed to ensure "[s]torage of drug products under appropriate conditions of temperature, humidity, and light so that the identity, strength, quality, and purity of the drug products are not affected." Stated differently, Defendants had a duty and were obligated to safely store, handle, and warehouse Ranitidine-Containing Drugs.

182. The FDA's own testing demonstrated the following rudimentary facts that would have helped reduce the hazards of Ranitidine-Containing Drugs had Defendants invested their profits into testing and research: (a) improper storage of Ranitidine-Containing Drugs has resulted in extremely high levels of NDMA; (b) NDMA can increase in Ranitidine-Containing Drugs even under normal storage conditions; (c) NDMA has been found to increase significantly in samples stored at higher temperatures, including temperatures the product may be exposed to during distribution and handling by consumers; and (d) Ranitidine-Containing Drugs age the level of NDMA in the product increases.

183. Based on these facts, other findings, and scientific research, the FDA concluded that these defects raised the level of NDMA in Ranitidine-Containing Drugs well above the safe daily intake limit to the point that Ranitidine-Containing Drugs had to be banned as of April 2020.

184. As early as 1980, consumer products containing unsafe levels of NDMA and other nitrosamines have been recalled by manufacturers, either voluntarily or at the direction of the FDA.

185. A 1979 news article noted that "NDMA has caused cancer in nearly every laboratory animal tested so far."[13]

186. In 1981, Dr. Silvio de Flora published the results of his experiments showing that ranitidine was converting into mutagenic N-nitroso compounds, of which NDMA is one, in human gastric fluid when accompanied by nitrites – a substance commonly found in food and in the body, including foods that consumers were informed that they could consume shortly before or after

---

[13] Jane Brody, *Bottoms Up: Alcohol in Moderation Can Extend Life*, GLOBE & MAIL (CANADA), Oct. 11, 1979 (emphasis added); *see* Rudy Platiel, *Anger Grows as Officials Unable to Trace Poison in Reserve's Water*, GLOBE & MAIL (CANADA), Jan. 6, 1990 (reporting that residents of Six Nations Indian Reserve "have been advised not to drink, cook or wash in the water because testing has found high levels of N-nitrosodimethylamine (NDMA), an industrial byproduct chemical that has been linked to cancer"); S.A. Kyrtopoulos, *DNA Adducts in Humans after Exposure to Methylating Agents*, 405 MUTATION RES. 2, 135 (1998) (noting that "chronic exposure of rats to very low doses of NDMA gives rise predominantly to liver tumors, including tumors of the liver cells (hepatocellular carcinomas), bile ducts, blood vessels and Kupffer cells").

ingesting ranitidine.[14]

187.    In a 2011 epidemiological study looking at NDMA dietary exposure with 3,268 cases and a follow up of 11.4 years, researchers concluded that "[d]ietary NDMA intake was significantly associated with increased cancer risk in men and women."[15]

188.    At all relevant times, Defendants failed to disclose to Plaintiff or her physicians the scientific link between ranitidine and NDMA.  More generally, Defendants also failed to disclose the scientific link to prescribing physicians of Ranitidine-Containing Drugs or the FDA.

**F.    Equitable Tolling**

189.    The nature of Plaintiff's injuries in relation to Defendants' conduct was not discovered, and through reasonable care and due diligence, could not have been discovered, until a date within the applicable statute of limitations for filing Plaintiff's claims.

190.    Within the period of any applicable statutes of limitation, Plaintiff was unaware and could not have discovered through the exercise of reasonable diligence that Defendants were not disclosing the dangerous levels of the carcinogen NDMA produced by Ranitidine-Containing Drugs, including Zantac.

191.    Plaintiff asserts all applicable statutory and common law rights and theories related to the tolling or extension of any applicable statute of limitations, including equitable tolling, delayed discovery, discovery rules, and/or fraudulent concealment.

192.    At all relevant times, Defendants knowingly, affirmatively, and actively concealed or recklessly disregarded the true risks of NDMA exposure associated with Ranitidine-Containing Drugs, including Zantac, and never disclosed this risk to the FDA or the consuming public.

193.    Based on the foregoing, Defendants are estopped from relying on any statutes of limitations or repose that might otherwise be applicable to Plaintiff's claims.

---

[14] Silvio de Flora, *Cimetidine, Ranitidine and Their Mutagenic Nitroso Derivatives*, 318 LANCET 8253, 993-94 (Oct. 31, 1981).

[15] Yet Hua Loh et al., *N-nitroso Compounds and Cancer Incidence: The European Prospective Investigation into Cancer and Nutrition (EPIC)-Norfolk Study*, 93 AM. J. CLINICAL NUTRITION 5, 1053-61 (May 2011).

## V.      CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### STRICT LIABILITY – DESIGN DEFECT

### (AGAINST ALL DEFENDANTS)

194.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if fully stated herein.

195.    At all relevant times, Defendants have been in the business of designing, manufacturing, labeling, marketing and promoting, selling, inspecting, handling, storing and distributing defective Ranitidine-Containing Drugs to consumers.

196.    At all relevant times, Defendants' Ranitidine-Containing Drugs have contained unreasonably dangerous design defects, including, but not limited to, grave risks that may follow the foreseeable use of Ranitidine-Containing Drugs.

197.    At all relevant times, Defendants had a duty to ensure that Ranitidine-Containing Drugs did not pose unreasonable and dangerous risks to consumers.

198.    Ranitidine-Containing Drugs did not perform as safely as an ordinary consumer would have expected when used in an intended and foreseeable manner.

199.    Plaintiff was harmed by ingesting defective and unreasonably dangerous Ranitidine-Containing Drugs without knowledge of the grave risks of cancer and other serious illnesses.

200.    The Ranitidine-Containing Drugs' failure to operate safely was a substantial factor in causing Plaintiff's harm.  Plaintiff ingested these drugs, which caused Plaintiff's conscious pain, suffering, and bodily impairment, including breast cancer.

### SECOND CAUSE OF ACTION

### STRICT LIABILITY – FAILURE TO WARN

### (AGAINST MANUFACTURER-DEFENDANTS)

201.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if fully stated herein.

202.    Defendants manufactured Ranitidine-Containing Drugs.

203. At all relevant times, Defendants' Zantac products reached the intended consumers, handlers, and users or other persons coming into contact with these products within this judicial district and throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendants.

204. The Ranitidine-Containing Drugs had potential risks that Defendants knew or were knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of manufacture.

205. The potential risk of cancer presented a substantial danger when Ranitidine-Containing Drugs are used in an intended and/or reasonably foreseeable way.

206. Ordinary consumers would not have been able to recognize the potential risks of cancer as a result of ingesting Ranitidine-Containing Drugs.

207. Defendants failed to adequately warn of potential risks from Ranitidine-Containing Drugs. During the time period Plaintiff ingested and/or was exposed to Ranitidine-Containing Drugs, the warnings associated with the product were incomplete, vague, or otherwise inadequate and failed to notify consumers to the health risks, including risks of cancer, stemming from the use of such Ranitidine-Containing Drugs.

208. Defendants failed to warn Plaintiff's prescribing physician and failed to provide Plaintiff's physicians with the potential risks that may follow the foreseeable use of Ranitidine-Containing Drugs.

209. The lack of sufficient warning was a substantial factor in causing Plaintiff's harm. As a result of the lack of sufficient warning, Plaintiff chose to ingest these drugs, which caused Plaintiff's conscious pain, suffering, and bodily impairment, including breast cancer.

### THIRD CAUSE OF ACTION

### NEGLIGENT MISREPRESENTATION

### (AGAINST MANUFACTURER-DEFENDANTS)

210. Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if fully stated herein.

---

**COMPLAINT**
31

211.    While representing carcinogenic Ranitidine-Containing Drugs as safe, Manufacturer-Defendants failed to employ manufacturing methods that ensured Ranitidine-Containing Drugs met the quality and purity characteristics they purported to possess.

212.    As early as 1981, scientific research was available that evidenced elevated rates of NDMA.  This was known or should have been known by the Defendants when they began marketing, promoting, labelling, and selling Ranitidine-Containing Drugs.

213.    Defendants failed to disclose this risk to consumers on the drug's label—or through any other means—and Defendants failed to report these risks to the FDA.

214.    The public, including Plaintiff, justifiably relies on information from the FDA and drug labels, as well as medical providers, to communicate potentially life-altering risks of exposure and/or ingestion of medications.

215.    As a result of Defendants' representation of the safety of Ranitidine-Containing Drugs, Plaintiff chose to ingest these drugs, which caused Plaintiff's conscious pain, suffering, and bodily impairment, including breast cancer.

### FOURTH CAUSE OF ACTION

**FRAUDULENT CONCEALMENT**

**(AGAINST MANUFACTURER-DEFENDANTS)**

216.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if fully stated therein.

217.    Despite the available scientific evidence of elevated rates of NDMA in Ranitidine-Containing Drugs, Defendants concealed the dangerous hazards of ingesting Zantac and Ranitidine-Containing Drugs from consumers by failing to report it to the FDA.  The FDA relies on manufacturers to present new and updated information regarding approved drugs.  The public, including Plaintiff, in turn depends on the FDA to make this information accessible to them.

COMPLAINT
32

218.    Manufacturers of an approved drug are required by regulations to submit an annual report to the FDA containing, among other things, new information regarding the drug's safety pursuant to C.F.R. § 314.81(b)(2) and 21 C.F.R. § 314.81(b)(2)(v).

219.    In addition to failing to report these significant risks to the FDA, the Manufacturer-Defendants deliberately concealed grave risks when marketing and promoting Ranitidine-Containing Drugs that were known to the Defendant-Manufacturers but unknown to Plaintiff.  These concealments were motivated by Manufacturers' desire to profit from Ranitidine-Containing Drugs by representing to consumers that they were safe.  Defendants were aware that full disclosure of the true life-threatening risks would likely cause the FDA recall long before April 1, 2020.

220.    Plaintiff would not have ingested neither the prescription nor OTC form of Ranitidine-Containing Drugs had she been aware of the severity of these risks.

221.    As a direct result of ingesting these drugs, Plaintiff experienced conscious pain and suffering and bodily impairment, including, but not limited to breast cancer, because of the ingestion and/or exposure to Ranitidine-Containing Drugs.

## FIFTH CAUSE OF ACTION
### NEGLIGENCE – MANUFACTURE
### (AGAINST MANUFACTURER-DEFENDANTS)

222.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if fully stated herein.

223.    Defendants distributed, marketed and/or sold Ranitidine-Containing Drugs to consumers within Los Angeles County.

224.    At all relevant times, Defendants knew or, in the exercise of reasonable care, should

have known, that Ranitidine-Containing Drugs were dangerous when used in a reasonably foreseeable manner.

225. At all relevant times, Defendants knew or should have known that Ranitidine Containing Drugs had been contaminated with an industrial chemical known to cause cancer.

226. At all relevant times, Defendants had a duty to exercise reasonable care in providing both OTC and prescription users' healthcare providers with: (a) specific directions for safe use of Ranitidine-Containing Drugs; (b) accurate, true, and correct information concerning the known or foreseeable risks of using Ranitidine-Containing Drugs as directed; and (c) appropriate, complete, and accurate warnings concerning the potential adverse effects of Ranitidine-Containing Drugs when used as intended, including the drugs' ability to transform into a carcinogenic compound, NDMA – through a means that could reasonably be expected to reach foreseeable users and consumers. Defendants had a duty to provide adequate warnings while Ranitidine-Containing Drugs remained on the market.

227. At all relevant times, Defendants had a further duty to avoid tendering into the marketplace a product which Defendants knew, or should have known, posed risks outweighing its benefits or which they knew, or should have known, was dangerous and unfit for ingestion by anyone.

228. Defendants' duty included exercising reasonable care to cease marketing and to discontinue Ranitidine-Containing Drugs when Defendants knew, or had reason to know, that the product should not be used for any purpose considering its relative risks.

229. Defendants knew or reasonably should have known that consumers would not be aware of the danger or the carcinogenic properties of Ranitidine-Containing Drugs when ingested.

230. Defendants failed to adequately warn of the danger of the consumption of Ranitidine Containing Drugs.

231. A reasonable manufacturer, distributor, or seller under the same or similar circumstances would have warned of the danger of the consumption of Ranitidine-Containing Drugs.

232. Defendants failed to warn Plaintiff's prescribing physician and failed to provide

Plaintiff's physician with the potential risks that may follow the foreseeable use of Ranitidine-Containing Drugs.

233.    Defendant also breached their duty of care by failing to undertake sufficient studies and conduct necessary tests to determine whether Ranitidine-Containing Drugs were safe for their intended and foreseeable consumer use.

234.    Defendants further breached their duty of care and were negligent in that while representing carcinogenic Ranitidine-Containing Drugs as safe, Defendants failed to employ manufacturing methods that ensured Ranitidine-Containing Drugs met the quality and purity characteristics they purported to possess.

235.    Defendants' breach of duty to Plaintiff was a substantial factor in causing Plaintiff's harm.

## SIXTH CAUSE OF ACTION
### NEGLIGENCE - RETAILER
### (AGAINST RETAILER-DEFENDANTS)

210.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if fully stated herein.

211.    Defendants sold, handled, and stored Ranitidine-Containing Drugs within Los Angeles County.

236.    At all relevant times, Defendants knew – or in the exercise of ordinary and reasonable care, should have known – of the hazards and dangers associated with Ranitidine-Containing Drugs' intended or foreseeable use.

237.    At all relevant times, Defendants knew, or reasonably should have known, that Ranitidine-Containing Drugs' carcinogenic properties caused them to be so dangerous that they should not have been purchased or consumed by anyone.

238.    At all relevant times, Defendants knew or should have known of the carcinogenic properties of NDMA when Ranitidine-Containing Drugs are ingested and/or the elevated levels of NDMA that result from the transport, handling, and storage of Ranitidine-Containing Drugs.

COMPLAINT
35

**EXHIBIT A -- PAGE 35**

239.    Defendants were charged with a continuing duty to provide appropriate and accurate instructions regarding the proper expiration and retest dates, as well as storage and handling of Ranitidine-Containing Drugs.

240.    Defendants had a duty to exercise ordinary care in storing ranitidine according to the temperature requirements on the label or otherwise informed of. Defendants breached their duty by failing to adhere to the established practices and procedures in storing Ranitidine-Containing Drugs. Ranitidine leads to NDMA exposure through the formation of NDMA over time under normal storage conditions and that increases significantly when exposed to heat. Defendants had a duty to exercise ordinary care in storing ranitidine in a way so as to avoid the formation of NDMA.

241.    Defendants' breach of duty was a substantial factor in causing Plaintiff's harm.

## PUNITIVE DAMAGES

## (AGAINST MANUFACTURER-DEFENDANTS)

242.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if fully stated herein.

243.    The Defendant-Manufacturers' conduct, as described above, was wanton, willful, and malicious, and carried out with conscious, reckless, and flagrant disregard for the rights, health, welfare, and safety of the consuming public, including Plaintiff.

244.    Since introducing Ranitidine-Containing Drugs to the market, the Defendant Manufacturers made conscious decisions to not properly manufacture, warn, test, or inform consumers, including Plaintiff, of Ranitidine-Containing Drugs' unreasonably dangerous condition.

245.    The Defendant-Manufacturers' officers, directors, and/or managing agents authorized and participated in the Defendant-Manufacturers' practice of concealing the known risks and exposing unsuspecting purchasers and users of Ranitidine-Containing Drugs to excessive levels of NDMA, a known carcinogen.

246.    The Defendant-Manufacturers deliberately marketed and promoted dangerous Ranitidine-Containing Drugs to mislead consumers, concealing grave risks known to the Defendant-Manufacturers but unknown to Plaintiff.   These concealments were motivated by Defendant-

Manufacturers' desire to profit from Ranitidine-Containing Drugs by representing to consumers that they were safe.  Defendants were aware that full disclosure of the true life-threatening risks would likely cause the FDA recall long before April 1, 2020.

247.    Thus, the Defendant-Manufacturers' willful, outrageous and malicious conduct warrants an award of punitive damages.

<b>PRAYER FOR RELIEF</b>

WHEREFORE, Plaintiff prays for judgment against Defendants, as follows:

A.  For an award of actual and compensatory damages in such amount to be determined at trial and as provided by applicable law;

B.  For exemplary and punitive damages sufficient to punish and deter Defendants and others from future wrongful practices;

C.  For pre-judgment and post-judgment interest;

D.  For reasonable attorneys' fees, court costs, and other litigation expenses; and

E.  Such other and further relief as this Court deems just and proper.

<b>DEMAND FOR JURY TRIAL</b>

Plaintiff hereby respectfully requests a trial by jury on all appropriate issues raised in this Complaint.

DATED: April 19, 2021                    BEVERLY HILLS TRIAL ATTORNEYS, P.C.


By:    _____
Azar Mouzari, Esq.
Attorneys for Plaintiff
MARINA GOLDEN

<b>COMPLAINT</b>
37
<b>EXHIBIT A -- PAGE 37</b>

**CM-010**

| | |
|---|---|
| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |

Azar Mouzari, Esq. (State Bar No. 263461)
Beverly Hills Trial Attorneys, P.C.
468 N. Camden Drive, Suite 238, Beverly Hills, CA 90210

TELEPHONE NO.: 310-858-5567  FAX NO.: 424-846-0963

ATTORNEY FOR *(Name):* Marina Golden

SUPERIOR COURT OF CALIFORNIA, COUNTY OF
STREET ADDRESS: 111 North Hill Street
MAILING ADDRESS: 111 North Hill Street
CITY AND ZIP CODE: Los Angeles, California 90012
BRANCH NAME: Stanley Mosk Courthouse

CASE NAME: Marina Golden v. SANOFI-AVENTIS U.S., LLC, et al.

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER: |
|---|---|---|
| ☒ Unlimited ☐ Limited | ☐ Counter ☐ Joinder | 21STCV14674 |
| (Amount demanded exceeds $25,000) (Amount demanded is $25,000 or less) | Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | JUDGE: <br> DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
☐ Auto (22)
☐ Uninsured motorist (46)
**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
☐ Asbestos (04)
☒ Product liability (24)
☐ Medical malpractice (45)
☐ Other PI/PD/WD (23)
**Non-PI/PD/WD (Other) Tort**
☐ Business tort/unfair business practice (07)
☐ Civil rights (08)
☐ Defamation (13)
☐ Fraud (16)
☐ Intellectual property (19)
☐ Professional negligence (25)
☐ Other non-PI/PD/WD tort (35)
**Employment**
☐ Wrongful termination (36)
☐ Other employment (15)

**Contract**
☐ Breach of contract/warranty (06)
☐ Rule 3.740 collections (09)
☐ Other collections (09)
☐ Insurance coverage (18)
☐ Other contract (37)
**Real Property**
☐ Eminent domain/Inverse condemnation (14)
☐ Wrongful eviction (33)
☐ Other real property (26)
**Unlawful Detainer**
☐ Commercial (31)
☐ Residential (32)
☐ Drugs (38)
**Judicial Review**
☐ Asset forfeiture (05)
☐ Petition re: arbitration award (11)
☐ Writ of mandate (02)
☐ Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
☐ Antitrust/Trade regulation (03)
☐ Construction defect (10)
☐ Mass tort (40)
☐ Securities litigation (28)
☐ Environmental/Toxic tort (30)
☐ Insurance coverage claims arising from the above listed provisionally complex case types (41)
**Enforcement of Judgment**
☐ Enforcement of judgment (20)
**Miscellaneous Civil Complaint**
☐ RICO (27)
☐ Other complaint *(not specified above)* (42)
**Miscellaneous Civil Petition**
☐ Partnership and corporate governance (21)
☐ Other petition *(not specified above)* (43)

2. This case ☐ is ☒ is not   complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. ☐ Large number of separately represented parties
   b. ☐ Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. ☐ Substantial amount of documentary evidence
   d. ☐ Large number of witnesses
   e. ☐ Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. ☐ Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. ☒ monetary  b. ☐ nonmonetary; declaratory or injunctive relief  c. ☒ punitive
4. Number of causes of action *(specify):*  6
5. This case ☐ is ☒ is not   a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: April 19, 2021

Azar Mouzari
(TYPE OR PRINT NAME)                     (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on **all** other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

| | | |
|---|---|---|
| Form Adopted for Mandatory Use <br> Judicial Council of California <br> CM-010 [Rev. July 1, 2007] | **CIVIL CASE COVER SHEET** | Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740; <br> Cal. Standards of Judicial Administration, std. 3.10 <br> *www.courtinfo.ca.gov* |

EXHIBIT A -- PAGE 38

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)–Personal Injury/Property Damage/Wrongful Death
Uninsured Motorist (46) (*if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto*)

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
Asbestos (04)
Asbestos Property Damage
Asbestos Personal Injury/ Wrongful Death
Product Liability *(not asbestos or toxic/environmental)* (24)
Medical Malpractice (45)
Medical Malpractice– Physicians & Surgeons
Other Professional Health Care Malpractice
Other PI/PD/WD (23)
Premises Liability (e.g., slip and fall)
Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
Intentional Infliction of Emotional Distress
Negligent Infliction of Emotional Distress
Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business Practice (07)
Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
Defamation (e.g., slander, libel) (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
Legal Malpractice
Other Professional Malpractice *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
Breach of Rental/Lease Contract *(not unlawful detainer or wrongful eviction)*
Contract/Warranty Breach–Seller Plaintiff *(not: fraud or negligence)*
Negligent Breach of Contract/ Warranty
Other Breach of Contract/Warranty
Collections (e.g., money owed, open book accounts) (09)
Collection Case–Seller Plaintiff
Other Promissory Note/Collections Case
Insurance Coverage *(not provisionally complex)* (18)
Auto Subrogation
Other Coverage
Other Contract (37)
Contractual Fraud
Other Contract Dispute

**Real Property**
Eminent Domain/Inverse Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
Writ of Possession of Real Property
Mortgage Foreclosure
Quiet Title
Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
Writ–Administrative Mandamus
Writ–Mandamus on Limited Court Case Matter
Writ–Other Limited Court Case Review
Other Judicial Review (39)
Review of Health Officer Order
Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
Abstract of Judgment (Out of County)
Confession of Judgment *(non-domestic relations)*
Sister State Judgment
Administrative Agency Award *(not unpaid taxes)*
Petition/Certification of Entry of Judgment on Unpaid Taxes
Other Enforcement of Judgment Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified above)* (42)
Declaratory Relief Only
Injunctive Relief Only *(non-harassment)*
Mechanics Lien
Other Commercial Complaint Case *(non-tort/non-complex)*
Other Civil Complaint *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
Partnership and Corporate Governance (21)
Other Petition *(not specified above)* (43)
Civil Harassment
Workplace Violence
Elder/Dependent Adult Abuse
Election Contest
Petition for Name Change
Petition for Relief From Late Claim
Other Civil Petition

Electronically FILED by Superior Court of California, County of Los Angeles on 04/19/2021 12:00 AM Sherri R. Carter, Executive Officer/Clerk of Court, by R. Clifton,Deputy Clerk

Case 2:21-cv-03793-SVW-PVC   Document 1-1   Filed 05/04/21   Page 41 of 48   Page ID #:51

| SHORT TITLE:<br>Marina Golden v. SANOFI-AVENTIS U.S., LLC, et al. | CASE NUMBER<br>21STCV14674 |
|---|---|

## CIVIL CASE COVER SHEET ADDENDUM AND STATEMENT OF LOCATION
## (CERTIFICATE OF GROUNDS FOR ASSIGNMENT TO COURTHOUSE LOCATION)

**This form is required pursuant to LASC Local Rule 2.0 in all new civil case filings in the Los Angeles Superior Court.**

Item I.  Check the types of hearing and fill in the estimated length of hearing expected for this case:

JURY TRIAL? ☑ YES    CLASS ACTION? ☐ YES    LIMITED CASE? ☐ YES    TIME ESTIMATED FOR TRIAL 5-7    ☐ HOURS/ ☑ DAYS

Item II. Select the correct district and courthouse location (4 steps – If you checked "Limited Case", skip to Item III, Pg. 4):

**Step 1:** After first completing the Civil Case Cover Sheet Form, find the main civil case cover sheet heading for your case in the left margin below, and, to the right in Column **A**, the Civil Case Cover Sheet case type you selected.

**Step 2:** Check **one** Superior Court type of action in Column **B** below which best describes the nature of this case.

**Step 3:** In Column **C**, circle the reason for the court location choice that applies to the type of action you have checked.
For any exception to the court location, see Los Angeles Superior Court Local Rule 2.0.

| Applicable Reasons for Choosing Courthouse Location (see Column C below) |
|---|

1. Class Actions must be filed in the County Courthouse, Central District.
2. May be filed in Central (Other county, or no Bodily Injury/Property Damage).
3. Location where cause of action arose.
4. Location where bodily injury, death or damage occurred.
5. Location where performance required or defendant resides.
6. Location of property or permanently garaged vehicle.
7. Location where petitioner resides.
8. Location wherein defendant/respondent functions wholly.
9. Location where one or more of the parties reside.
10. Location of Labor Commissioner Office.

**Step 4:** Fill in the information requested on page 4 in Item III; complete Item IV.  Sign the declaration.

| | A<br>Civil Case Cover Sheet<br>Category No. | B<br>Type of Action<br><br>(Check only one) | C<br>Applicable Reasons -<br>See Step 3 Above |
|---|---|---|---|
| **Auto Tort** | Auto (22) | ☐ A7100  Motor Vehicle - Personal Injury/Property Damage/Wrongful Death | 1., 2., 4. |
| | Uninsured Motorist (46) | ☐ A7110  Personal Injury/Property Damage/Wrongful Death – Uninsured Motorist | 1., 2., 4. |
| **Other Personal Injury/Property Damage/Wrongful Death Tort** | Asbestos  (04) | ☐ A6070  Asbestos Property Damage | 2. |
| | | ☐ A7221  Asbestos - Personal Injury/Wrongful Death | 2. |
| | Product Liability (24) | ☑ A7260  Product Liability (not asbestos or toxic/environmental) | 1., 2., 3., 4., 8. |
| | Medical Malpractice (45) | ☐ A7210  Medical Malpractice - Physicians & Surgeons | 1., 2., 4. |
| | | ☐ A7240  Other Professional Health Care Malpractice | 1., 2., 4. |
| | Other<br>Personal Injury<br>Property Damage<br>Wrongful Death<br>(23) | ☐ A7250  Premises Liability (e.g., slip and fall) | 1., 2., 4. |
| | | ☐ A7230  Intentional Bodily Injury/Property Damage/Wrongful Death (e.g., assault, vandalism, etc.) | 1., 2., 4. |
| | | ☐ A7270  Intentional Infliction of Emotional Distress | 1., 2., 3. |
| | | ☐ A7220  Other Personal Injury/Property Damage/Wrongful Death | 1., 2., 4. |
| **Non-Personal Injury/Property Damage/Wrongful Death Tort** | Business Tort  (07) | ☐ A6029  Other Commercial/Business Tort (not fraud/breach of contract) | 1., 2., 3. |
| | Civil Rights (08) | ☐ A6005  Civil Rights/Discrimination | 1., 2., 3. |
| | Defamation (13) | ☐ A6010  Defamation (slander/libel) | 1., 2., 3. |
| | Fraud (16) | ☐ A6013  Fraud (no contract) | 1., 2., 3. |

| SHORT TITLE: | CASE NUMBER |
|---|---|
| Marina Golden v. SANOFI-AVENTIS U.S., LLC, et al. | |

| | **A**<br>Civil Case Cover Sheet Category No. | **B**<br>Type of Action<br>(Check only one) | **C**<br>Applicable Reasons<br>-See Step 3 Above |
|---|---|---|---|
| **Non-Personal Injury/Property Damage/ Wrongful Death Tort (Cont d.)** | Professional Negligence (25) | ☐ A6017  Legal Malpractice<br>☐ A6050  Other Professional Malpractice (not medical or legal) | 1., 2., 3.<br>1., 2., 3. |
| | Other (35) | ☐ A6025  Other Non-Personal Injury/Property Damage tort | 2.,3. |
| **Employment** | Wrongful Termination (36) | ☐ A6037  Wrongful Termination | 1., 2., 3. |
| | Other Employment (15) | ☐ A6024  Other Employment Complaint Case<br>☐ A6109  Labor Commissioner Appeals | 1., 2., 3.<br>10. |
| **Contract** | Breach of Contract/ Warranty (06) (not insurance) | ☐ A6004 Breach of Rental/Lease Contract (not Unlawful Detainer or wrongful eviction)<br>☐ A6008  Contract/Warranty Breach -Seller Plaintiff (no fraud/negligence)<br>☐ A6019  Negligent Breach of Contract/Warranty (no fraud)<br>☐ A6028  Other Breach of Contract/Warranty (not fraud or negligence) | 2., 5.<br>2., 5.<br>1., 2., 5.<br>1., 2., 5. |
| | Collections (09) | ☐ A6002  Collections Case-Seller Plaintiff<br>☐ A6012  Other Promissory Note/Collections Case | 2., 5., 6.<br>2., 5. |
| | Insurance Coverage (18) | ☐ A6015  Insurance Coverage (not complex) | 1., 2., 5., 8. |
| | Other Contract (37) | ☐ A6009  Contractual Fraud<br>☐ A6031  Tortious Interference<br>☐ A6027  Other Contract Dispute(not breach/insurance/fraud/negligence) | 1., 2., 3., 5.<br>1., 2., 3., 5.<br>1., 2., 3., 8. |
| **Real Property** | Eminent Domain/Inverse Condemnation (14) | ☐ A7300  Eminent Domain/Condemnation        Number of parcels_____ | 2. |
| | Wrongful Eviction (33) | ☐ A6023  Wrongful Eviction Case | 2., 6. |
| | Other Real Property (26) | ☐ A6018  Mortgage Foreclosure<br>☐ A6032  Quiet Title<br>☐ A6060  Other Real Property (not eminent domain, landlord/tenant, foreclosure) | 2., 6.<br>2., 6.<br>2., 6. |
| **Unlawful Detainer** | Unlawful Detainer-Commercial (31) | ☐ A6021  Unlawful Detainer-Commercial (not drugs or wrongful eviction) | 2., 6. |
| | Unlawful Detainer-Residential (32) | ☐ A6020  Unlawful Detainer-Residential (not drugs or wrongful eviction) | 2., 6. |
| | Unlawful Detainer-Drugs (38) | ☐ A6022  Unlawful Detainer-Drugs | 2., 6. |
| **Judicial Review** | Asset Forfeiture (05) | ☐ A6108  Asset Forfeiture Case | 2., 6. |
| | Petition re Arbitration (11) | ☐ A6115  Petition to Compel/Confirm/Vacate Arbitration | 2., 5. |

CIV 109 03-04 (Rev. 03/06)

LASC Approved

**CIVIL CASE COVER SHEET ADDENDUM**
**AND STATEMENT OF LOCATION**
EXHIBIT A PAGE 41

LASC, rule 2.0

Page 2 of 4

| SHORT TITLE: | CASE NUMBER |
|---|---|
| Marina Golden v. SANOFI-AVENTIS U.S., LLC, et al. | |

| | **A**<br>Civil Case Cover Sheet<br>Category No. | **B**<br>Type of Action<br>(Check only one) | **C**<br>Applicable Reasons -<br>See Step 3 Above |
|---|---|---|---|
| **Judicial Review (Cont'd.)** | Writ of Mandate<br><br>(02) | ☐ A6151   Writ - Administrative Mandamus | 2., 8. |
| | | ☐ A6152    Writ - Mandamus on Limited Court Case Matter | 2. |
| | | ☐ A6153    Writ - Other Limited Court Case Review | 2. |
| | Other Judicial Review<br>(39) | ☐ A6150   Other Writ /Judicial Review | 2., 8. |
| **Provisionally Complex Litigation** | Antitrust/Trade<br>Regulation (03) | ☐ A6003   Antitrust/Trade Regulation | 1., 2., 8. |
| | Construction Defect (10) | ☐ A6007   Construction defect | 1., 2., 3. |
| | Claims Involving Mass<br>Tort (40) | ☐ A6006    Claims Involving Mass Tort | 1., 2., 8. |
| | Securities Litigation (28) | ☐ A6035   Securities Litigation Case | 1., 2., 8. |
| | Toxic Tort<br>Environmental  (30) | ☐ A6036   Toxic Tort/Environmental | 1., 2., 3., 8. |
| | Insurance Coverage<br>Claims from Complex<br>Case (41) | ☐ A6014   Insurance Coverage/Subrogation (complex case only) | 1., 2., 5., 8. |
| **Enforcement of Judgment** | Enforcement<br>of Judgment<br><br>(20) | ☐ A6141   Sister State Judgment | 2., 9. |
| | | ☐ A6160   Abstract of Judgment | 2., 6. |
| | | ☐ A6107   Confession of Judgment (non-domestic relations) | 2., 9. |
| | | ☐ A6140   Administrative Agency Award (not unpaid taxes) | 2., 8. |
| | | ☐ A6114   Petition/Certificate for Entry of Judgment on Unpaid Tax | 2., 8. |
| | | ☐ A6112   Other Enforcement of Judgment Case | 2., 8., 9. |
| **Miscellaneous Civil Complaints** | RICO (27) | ☐ A6033   Racketeering (RICO) Case | 1., 2., 8. |
| | Other Complaints<br>(Not Specified Above)<br><br>(42) | ☐ A6030   Declaratory Relief Only | 1., 2., 8. |
| | | ☐ A6040   Injunctive Relief Only (not domestic/harassment) | 2., 8. |
| | | ☐ A6011   Other Commercial Complaint Case (non-tort/non-complex) | 1., 2., 8. |
| | | ☐ A6000   Other Civil Complaint (non-tort/non-complex) | 1., 2., 8. |
| **Miscellaneous Civil Petitions** | Partnership Corporation<br>Governance(21) | ☐ A6113   Partnership and Corporate Governance Case | 2., 8. |
| | Other Petitions<br>(Not Specified Above)<br><br>(43) | ☐ A6121   Civil Harassment | 2., 3., 9. |
| | | ☐ A6123   Workplace Harassment | 2., 3., 9. |
| | | ☐ A6124   Elder/Dependent Adult Abuse Case | 2., 3., 9. |
| | | ☐ A6190   Election Contest | 2. |
| | | ☐ A6110   Petition for Change of Name | 2., 7. |
| | | ☐ A6170   Petition for Relief from Late Claim Law | 2., 3., 4., 8. |
| | | ☐ A6100   Other Civil Petition | 2., 9. |

**CIVIL CASE COVER SHEET ADDENDUM**
**AND STATEMENT OF LOCATION**
EXHIBIT A, PAGE 42

| SHORT TITLE:<br>Marina Golden v. SANOFI-AVENTIS U.S., LLC, et al. | CASE NUMBER |
| --- | --- |

Item III. Statement of Location: Enter the address of the accident, party's residence or place of business, performance, or other circumstance indicated in Item II., **Step 3** on Page 1, as the proper reason for filing in the court location you selected.

| REASON: CHECK THE NUMBER UNDER COLUMN C<br>WHICH APPLIES IN THIS CASE<br><br>☐1. ☐2. ☐3. ☑4. ☐5. ☐6. ☐7. ☐8. ☐9. ☐10. | ADDRESS: |
| --- | --- |
| CITY: | STATE: | ZIP CODE: | |

Item IV. *Declaration of Assignment*: I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that the above-entitled matter is properly filed for assignment to the <u>Stanley Mosk</u> courthouse in the <u>Central</u> District of the Los Angeles Superior Court  (Code Civ. Proc., § 392 et seq., and LASC Local Rule 2.0, subds. (b), (c) and (d)).

Dated:  <u>April 19, 2021</u>

<u>(SIGNATURE OF ATTORNEY/FILING PARTY)</u>

---

**PLEASE HAVE THE FOLLOWING ITEMS COMPLETED AND READY TO BE FILED IN ORDER TO PROPERLY COMMENCE YOUR NEW COURT CASE:**

1. Original Complaint or Petition.

2. If filing a Complaint, a completed Summons form for issuance by the Clerk.

3. Civil Case Cover Sheet form CM-010.

4. Complete Addendum to Civil Case Cover Sheet form LASC Approved CIV 109 03-04 (Rev. 03/06).

5. Payment in full of the filing fee, unless fees have been waived.

6. Signed order appointing the Guardian ad Litem, JC form 982(a)(27), if the plaintiff or petitioner is a minor under 18 years of age, or if required by Court.

7. Additional copies of documents to be conformed by the Clerk. Copies of the cover sheet and this addendum must be served along with the summons and complaint, or other initiating pleading in the case.

21STCV14674
Electronically FILED by Superior Court of California, County of Los Angeles on 04/19/2021 03:51 PM Sherri R. Carter, Executive Officer/Clerk of Court, by V. Delgadillo,Deputy Clerk

**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

<table>
<tr><td></td><td><b>FOR COURT USE ONLY</b><br><i>(SOLO PARA USO DE LA CORTE)</i></td></tr>
</table>

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*

SANOFI-AVENTIS U.S., LLC, a Delaware Corporation; Additional Parties Attachment Form is
attached.

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

MARINA GOLDEN, an individual.

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

   You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

   There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

   *Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

   *Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| | |
|---|---|
| The name and address of the court is:<br>*(El nombre y dirección de la corte es):*  Stanley Mosk Courthouse<br>Superior Court of California, County of Los Angeles<br>111 North Hill Street, Los Angeles, California 90012 | CASE NUMBER: *(Número del Caso):*<br>21STCV14674 |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is: *(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*

Azar Mouzari, Beverly Hills Trial Attorneys, P.C., 468 N. Camden Drive, Suite 238, Beverly Hills CA 90210, 310-858-5567

| | | | |
|---|---|---|---|
| DATE:<br>*(Fecha)* 04/19/2021 | Sherri R. Carter Executive Officer / Clerk of Court | Clerk, by<br>*(Secretario)*  V. Delgadillo | , Deputy<br>*(Adjunto)* |

*(For proof of service of this summons, use* Proof of Service of Summons *(form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario* Proof of Service of Summons *(POS-010).)*



[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served

1. ☐ as an individual defendant.

2. ☐ as the person sued under the fictitious name of *(specify)*:

3. ☐ on behalf of *(specify)*:

    under: ☐ CCP 416.10 (corporation)        ☐ CCP 416.60 (minor)
              ☐ CCP 416.20 (defunct corporation)    ☐ CCP 416.70 (conservatee)
              ☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)
              ☐ other *(specify)*:

4. ☐ by personal delivery on *(date)*

                                                                             **Page 1 of 1**

| | | |
|---|---|---|
| Form Adopted for Mandatory Use<br>Judicial Council of California<br>SUM-100  [Rev. July 1, 2009] | **SUMMONS** | Code of Civil Procedure §§ 412.20, 465<br>*www.courts.ca.gov* |

# EXHIBIT A -- PAGE 44

SUM-200(A)

| SHORT TITLE:<br>Marina Golden v. SANOFI-AVENTIS U.S., LLC, et al. | CASE NUMBER:<br>21STCV14674 |

## INSTRUCTIONS FOR USE

→ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.

→ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

**List additional parties** *(Check only one box. Use a separate page for each type of party.)*:

☐ Plaintiff   ☒ Defendant   ☐ Cross-Complainant   ☐ Cross-Defendant

BOEHRINGER INGELHEIM PHARMACEUTICALS, INC., a Delaware Corporation; GLAXOSMITHKLINE, LLC, a Delaware Limited Liability Company; PFIZER, INC., a Delaware Corporation; AMERISOURCE HEALTH SERVICES, LLC, a Delaware Corporation; MYLAN PHARMACEUTICALS, INC., a West Virginia Corporation; PAR PHARMACEUTICAL, INC., a New York Corporation; L. PERRIGO COMPANY, a Michigan Corporation; TARO PHARMACEUTICALS U.S.A., INC., a New York Corporation;  TEVA PHARMACEUTICALS USA, INC., a Delaware Corporation; WOCKHARDT USA, LLC, a Delaware Limited Liability Company; ZYDUS PHARMACEUTICALS (USA), Inc., a New Jersey Corporation; CVS PHARMACY, INC., a Delaware Corporation; THE KROGER CO., an Ohio Corporation; WALGREEN CO., an Illinois Corporation; WALMART INC., an Arkansas Corporation, ALBERTSONS COMPANIES, INC., a Delaware Corporation; RITE AID CORPORATION, a Pennsylvania Corporation; and DOES 1-10, inclusive.

Page ___1___ of ___1___

Page 1 of 1

**ADDITIONAL PARTIES ATTACHMENT**
**Attachment to Summons**

# EXHIBIT A -- PAGE 45

| SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF LOS ANGELES | Reserved for Clerk's File Stamp |
|---|---|
| COURTHOUSE ADDRESS:<br>Spring Street Courthouse<br>312 North Spring Street, Los Angeles, CA 90012 | **FILED**<br>Superior Court of California<br>County of Los Angeles<br>04/19/2021<br>Sherri R. Carter, Executive Officer / Clerk of Court<br>By: _____ R. Clifton _____ Deputy |
| **NOTICE OF CASE ASSIGNMENT**<br><br>**UNLIMITED CIVIL CASE** | |
| **Your case is assigned for all purposes to the judicial officer indicated below.** | CASE NUMBER:<br>21STCV14674 |

### THIS FORM IS TO BE SERVED WITH THE SUMMONS AND COMPLAINT

| | ASSIGNED JUDGE | DEPT | ROOM | | | ASSIGNED JUDGE | DEPT | ROOM |
|---|---|---|---|---|---|---|---|---|
| ✔ | Thomas D. Long | 31 | | | | | | |

Given to the Plaintiff/Cross-Complainant/Attorney of Record

on 04/19/2021
(Date)

Sherri R. Carter, Executive Officer / Clerk of Court

By R. Clifton _____, Deputy Clerk

LACIV 190 (Rev 6/18)
LASC Approved 05/06

**NOTICE OF CASE ASSIGNMENT — UNLIMITED CIVIL CASE**

**EXHIBIT A -- PAGE 46**

## INSTRUCTIONS FOR HANDLING UNLIMITED CIVIL CASES

The following critical provisions of the California Rules of Court, Title 3, Division 7, as applicable in the Superior Court, are summarized for your assistance.

### APPLICATION
The Division 7 Rules were effective January 1, 2007.  They apply to all general civil cases.

### PRIORITY OVER OTHER RULES
The Division 7 Rules shall have priority over all other Local Rules to the extent the others are inconsistent.

### CHALLENGE TO ASSIGNED JUDGE
A challenge under Code of Civil Procedure Section 170.6 must be made within **15** days after notice of assignment for all purposes to a judge, or if a party has not yet appeared, within 15 days of the first appearance.

### TIME STANDARDS
Cases assigned to the Independent Calendaring Courts will be subject to processing under the following time standards:

### COMPLAINTS
All complaints shall be served within 60 days of filing and proof of service shall be filed within 90 days.

### CROSS-COMPLAINTS
Without leave of court first being obtained, no cross-complaint may be filed by any party after their answer is filed.  Cross-complaints shall be served within 30 days of the filing date and a proof of service filed within 60 days of the filing date.

### STATUS CONFERENCE
A status conference will be scheduled by the assigned Independent Calendar Judge no later than 270 days after the filing of the complaint.  Counsel must be fully prepared to discuss the following issues: alternative dispute resolution, bifurcation, settlement, trial date, and expert witnesses.

### FINAL STATUS CONFERENCE
The Court will require the parties to attend a final status conference not more than 10 days before the scheduled trial date.  All parties shall have motions in limine, bifurcation motions, statements of major evidentiary issues, dispositive motions, requested form jury instructions, special jury instructions, and special jury verdicts timely filed and served prior to the conference.  These matters may be heard and resolved at this conference.  At least five days before this conference, counsel must also have exchanged lists of exhibits and witnesses, and have submitted to the court a brief statement of the case to be read to the jury panel as required by Chapter Three of the Los Angeles Superior Court Rules.

### SANCTIONS
The court will impose appropriate sanctions for the failure or refusal to comply with Chapter Three Rules, orders made by the Court, and time standards or deadlines established by the Court or by the Chapter Three Rules.  Such sanctions may be on a party, or if appropriate, on counsel for a party.

**This is not a complete delineation of the Division 7 or Chapter Three Rules, and adherence only to the above provisions is therefore not a guarantee against the imposition of sanctions under Trial Court Delay Reduction.  Careful reading and compliance with the actual Chapter Rules is imperative.**

### Class Actions
Pursuant to Local Rule 2.3, all class actions shall be filed at the Stanley Mosk Courthouse and are randomly assigned to a complex judge at the designated complex courthouse.  If the case is found not to be a class action it will be returned to an Independent Calendar Courtroom for all purposes.

### *Provisionally Complex Cases
Cases filed as provisionally complex are initially assigned to the Supervising Judge of complex litigation for determination of complex status.  If the case is deemed to be complex within the meaning of California Rules of Court 3.400 et seq., it will be randomly assigned to a complex judge at the designated complex courthouse.  If the case is found not to be complex, it will be returned to an Independent Calendar Courtroom for all purposes.

**NOTICE OF CASE ASSIGNMENT – UNLIMITED CIVIL CASE**

EXHIBIT A -- PAGE 47